# LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement is made as of April 10, 2023 by and between Peter Wayne Restad, an Individual (the "***Borrower***") and FBN Finance, LLC, a Delaware limited liability company (the "***Lender***").

SECTION 1. DEFINITIONS AND EXHIBITS.

1.1 Definitions. Capitalized terms used but not otherwise defined herein shall have the meanings set forth on Exhibit A attached hereto.

1.2 Conventions; Interpretation. For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires:

1.2.1 References to any Person refer to such Person and its successor in title and assigns or (as the case may be) its successors, assigns, heirs, executors, administrators and other legal representatives;

1.2.2 References to this Agreement refer to such document as originally executed and as may be amended, restated or otherwise modified from time to time in accordance with the provisions hereof;

1.2.3 Words importing the singular only shall include the plural and vice versa, and words importing the neutral gender shall include the masculine gender or the feminine gender, as applicable, and vice versa, and all references to dollars shall be to United States Dollars; and

1.2.4 All accounting terms shall be construed, applied and determined in accordance with GAAP.

1.3 Exhibits and Schedule. The following exhibits and schedule are attached hereto and incorporated by reference herein:

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Advance Request |
| Schedule | Disclosure Schedule |

SECTION 2. CREDIT FACILITIES.

2.1 Credit Facility.

2.1.1 Loan Advances. Upon the terms and subject to the conditions of this Agreement, and in reliance upon the representations, warranties and covenants of the Borrower made herein, the Lender agrees to extend a loan to the Borrower, and make one or more incremental principal draws against the Loan Amount (each an "Advance," and collectively, the "Advances") to the Borrower, from time to time, from and after the date hereof and prior to the Maturity Date, provided that the aggregate principal amount of Advances advanced, and outstanding at any time (not inclusive of Protective Advances), shall not exceed $500,000.00 (the

"**Loan Amount**"); provided, further, that if the Borrower or an affiliate of the Borrower is party to an operating loan agreement with Lender at the time of closing of this Agreement, the aggregate amount of Advances available to the Borrower shall be limited to 50% of the Loan Amount until Borrower or its affiliate has repaid, in full, all amounts due under any unpaid operating loans owed to Lender; provided, further, that at the time of any such request for an Advance and after giving effect to the making thereof there has not occurred and is not continuing any Default. The loan described herein shall be evidenced by a promissory note made by the Borrower payable to the order of the Lender, which such promissory note shall be in form and substance satisfactory to the Lender (the "***Note***"). The Lender shall fund each Advance by depositing funds into the Loan Funding Account. The credit extended under this Agreement shall be made on a revolving basis, such that all or any portion of the principal of the Loan Amount may be borrowed, paid, reborrowed, and repaid from time to time prior to the Maturity Date in accordance with the provisions of this Agreement, the Note, and other Loan Documents.

2.1.2 Interest. Your loan has a variable rate feature and as such, the interest rate may change each month with changes in the index which is the Wall Street Journal Prime Rate as published in the "Money Rates" table in the Wall Street Journal from time to time, which will be the "prime rate". The prime rate plus the margin amount that Lender adds, which is 0.10 as of the date of this Agreement, creates the interest rate applicable to unpaid Advances under this Agreement. The interest rate as of the date of this Agreement is eight and one tenth percent (8.1%).. If the prime rate changes, any new rate will be applied as of the first day of the subsequent month. Interest shall be due and payable as provided in Section 2.5 of this Agreement and the Note.

2.1.3 Prepayment; Maturity. Subject to the provisions of the Note, the Borrower may prepay outstanding Advances in whole or in part at any time without premium or penalty. On the Maturity Date, the Borrower shall repay all Obligations then outstanding with respect to Advances, this Agreement and the other Loan Documents.

2.2 Default Interest. If any Event of Default shall occur and be continuing, then, upon the Lender's election, the unpaid principal and interest balances of the Advances shall bear interest at the lower of (a) eighteen percent (18%) per year (pro-rata), or (b) the highest rate permitted by applicable law (the "***Default Rate***").

2.3 Intentionally Deleted.

2.4 Lender's Expenses. The Borrower will pay and indemnify the Lender, and hold the Lender harmless against, all out-of-pocket charges and expenses, including without limitation reasonable attorneys' fees and expenses, incurred or expended by the Lender in connection with the enforcement of the Lender's rights hereunder or under the other Loan Documents. Any and all amounts owed pursuant to this Section shall (a) be paid on written demand therefore, (b) bear interest at the Default Rate from the fifth (5th) Business Day following demand therefore until paid in full and (c) constitute Obligations secured by the Collateral.

2.5 Computation of Interest and Fees, Payments, Etc. Interest, fees and charges shall be computed daily on the basis of a year of 365 days, paid for the actual number of days for which due, and shall be due and payable in arrears on the Maturity Date. If the due date for any payment of principal is extended by operation of law, interest shall be payable for such extended time. If any payment required by this Agreement becomes due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension shall be included in computing interest in connection with such payment. All payments required of the

Borrower hereunder shall be made by the Borrower to the Lender at the address specified on the signature page hereto (or at such other place as the Lender may from time to time specify in writing) in lawful money of the United States of America in federal or other funds immediately available to the recipient thereof at the prescribed place of payment without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments.

2.6 Interest Limitations. If, at any time, the rate of interest together with all amounts which constitute interest and which are reserved, charged or taken by the Lender as compensation for fees, services or expenses incidental to the making, negotiating, or collection of the Obligations, shall be deemed by any competent court of law, governmental agency or tribunal to exceed the maximum rate of interest permitted to be charged by the Lender to the Borrower under applicable law, then, during such time as such rate of interest would be deemed excessive, that portion of each sum paid attributable to that portion of such interest that exceeds the maximum rate of interest so permitted shall be deemed a voluntary prepayment of principal of the Obligations, to be applied as determined by the Lender in its sole and absolute discretion. As used herein the term "applicable law" shall mean the law in effect from time to time; provided, however, that, in the event that there is a change in the law which results in a higher permissible rate of interest, then this Agreement and the Advances shall be governed by such new law as of its effective date.

2.7 Accounting. Lender shall maintain a loan account (the "***Loan Account***") on its books to record Advances and all payments thereon made by Borrower. All entries in the Loan Account shall be made in accordance with Lender's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded in Lender's books and records at any time shall be conclusive and binding evidence of the amounts due and owing to Lender by Borrower absent manifest error; provided, however, that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's duty to pay all amounts owing hereunder or under the Note. Lender shall endeavor to provide Borrower with a monthly statement regarding the Loan Account (but Lender shall not have any liability if Lender shall fail to provide any such statement). Unless any Borrower notifies Lender of any objection to any such statement (specifically describing the basis for such objection) within ninety (90) days after the date of receipt thereof, it shall be deemed final, binding and conclusive upon Borrower in all respects as to all matters reflected therein.

SECTION 3. REPRESENTATIONS AND WARRANTIES.

The Borrower represents, warrants and covenants as follows:

3.1 Organization and Qualification. The Borrower: (a) has all requisite power and authority to own its property and conduct its business as now conducted and as presently contemplated; (b) is duly qualified and in good standing in each jurisdiction where the nature of the Borrower's properties or the Borrower's business (present or proposed) requires such qualification; and (c) has no Subsidiaries or Affiliates except as set forth on the Disclosure Schedule.

3.2 Authority; Valid Obligations; Approvals. The execution, delivery and performance of this Agreement and the other Loan Documents, and the transactions and other documents contemplated hereby and thereby, are within the Borrower's authority and power and have been authorized by all necessary proceedings on the part of the Borrower and its and shareholders (if applicable), and do not and will not (a) contravene any provision of law or the Borrower's charter , (b) contravene any provisions of, or constitute a Default hereunder or a breach or default under,

any other material agreement, instrument, judgment, order, decree, permit, license or undertaking binding upon or applicable to the Borrower or any of its properties, or (c) result in the creation, other than in favor of the Lender, of any Lien upon any of the properties or assets of the Borrower. The Loan Documents have been (or will be) duly executed and delivered and constitute (or when executed and delivered will constitute) the legal, valid and binding obligations of the Borrower enforceable in accordance with their terms, subject to bankruptcy, insolvency and similar laws affecting creditors' rights in general and to the availability of equitable remedies. The execution, delivery and performance of this Agreement and the other Loan Documents, and the transactions and other documents contemplated hereby and thereby, also do not require any approval or consent of, or filing or registration with, any Person or governmental authority, except for (a) the filing of UCC-1 financing statements to perfect the Lender's security interests in the Collateral and effective financing statements under the Food Security Act, and (b) such other approvals or consents described on the Disclosure Schedule, each of which has been accomplished or obtained.

3.3 Intentionally Deleted.

3.4 Compliance. The Borrower: (a) has all necessary permits, approvals, authorizations, consents, licenses, franchises, registrations and other rights and privileges (including without limitation patents, trademarks, trade names and copyrights) to allow the Borrower to own and operate its business without any violation of law or the rights of others; (b) is duly authorized, qualified and licensed under and in compliance with all applicable laws, regulations, authorizations and orders of public authorities (including, without limitation, laws relating to restricted use pesticides, hazardous materials, hazardous waste, oil, and protection of the environment); and (c) has performed all obligations required to be performed by the Borrower under, and is not in default under or in violation of, its charter or any agreement, lease, mortgage, note, bond, indenture, license or other instrument or undertaking to which the Borrower is a party or by which any of the Borrower's properties are bound; in each case, except for any such violations, defaults or failures to comply, individually or in the aggregate, which would not have a Material Adverse Effect. The Borrower has not received any notice by any governmental authority or Person with respect to the generation, storage, or disposal or release or threat of release of hazardous substances or hazardous materials or with respect to any violation of any federal, state or local environmental, health or safety statute or regulation.

3.5 Financial Statements. The Borrower has furnished to the Lender certain financial information and documentation during the application process, which fairly present the financial position of the Borrower in all material respects for such periods as at the close of business on such dates and the results of the Borrower's operations therefore. At the date hereof, the Borrower has no material Indebtedness or other liabilities, whether accrued, absolute, contingent or otherwise, and whether due or to become due, that are not set forth in the initial financial information and documentation referenced herein, and Borrower represents that no event has occurred which could reasonably be expected to have a Material Adverse Effect.

3.6 Events of Default; Solvency. As of the date of this Agreement, no Default exists, and the Borrower is not, and immediately after giving effect to the advance of the Advances, will not be, Insolvent.

3.7 Taxes. The Borrower has filed all federal, state and other tax returns required to be filed for all Taxes, and has fully paid all Taxes due from the Borrower, except those being contested in good faith through appropriate proceedings and with respect to which adequate reserves have been established and are being maintained to the extent required by GAAP. The Borrower has not executed any waiver that would have the effect of extending the applicable

statute of limitations in respect of any Tax. The Borrower has established on the Borrower's books reserves adequate for the payment of all Taxes.

3.8 Labor Relations; Litigation. The Borrower is not engaged in any unfair labor practice and, except as set forth on the Disclosure Schedule, there is no litigation, proceeding, governmental investigation (administrative or judicial) or labor dispute, pending or, to the best knowledge of the Borrower, threatened against the Borrower or any other Person, which, if decided adversely to the Borrower or such Person, could have a Material Adverse Effect or materially and adversely affect the ability of the Borrower to perform the Borrower's obligations under the Loan Documents.

3.9 Capitalization. The outstanding equity of the Borrower is comprised of capital stock or membership interests, all of which has been duly and validly issued and is fully paid and nonassessable. All of the issued and outstanding capital stock or membership interests of the Borrower is owned and held as set forth in the Disclosure Schedule, and except as set forth in the charter of the Borrower or in the Disclosure Schedule, (a) there are no rights to acquire any equity interests in the Borrower, (b) there are no outstanding commitments, options, warrants, calls, profits interests or other agreements (whether written or oral) binding on the Borrower which require or could require the Borrower to sell, grant, transfer, assign, mortgage, pledge or otherwise dispose of any equity interests or other securities of the Borrower, and (c) there is no other outstanding class of equity interests or other securities of the BorrowerIntentionally deleted.

3.10 Environmental and Regulatory Compliance. The operations of the Borrower and each of the real properties owned by the Borrower and, to the Borrower's knowledge, each of the real properties leased or occupied by the Borrower, are presently in compliance in all material respects with, and has in full force and effect, all material permits or approvals required by all applicable building, zoning, antipollution, hazardous substance, hazardous material, oil, environmental, health, safety or other laws, ordinances or regulations, and the Borrower has not received notification that the Borrower or any of such properties is in violation of any of the foregoing provisions. No inquiry, notice or threat to give notice by any governmental authority or third party has been received by the Borrower with respect to the generation, storage, disposal, release or threat of release of any hazardous substance or hazardous material, or with respect to any violation of any federal, state or local environmental, health or safety statute or regulation.

3.11 Credit Application. All of the information provided on and in connection with the Credit Application was at the time delivered to the Lender, and continues to be, true, accurate and correct in all material respects.

3.12 Accuracy of Representations; Survival. No representation or warranty made by the Borrower herein or in any other Loan Document contains, or at the time of delivery shall contain, any untrue statement of material fact or omits, or shall omit at the time of delivery, a material fact necessary to make such representation or warranty not misleading. All representations and warranties made herein or in any other Loan Document shall survive the execution of this Agreement and the other Loan Documents.

SECTION 4. CONDITIONS OF THE LOAN.

4.1 Conditions to Closing. The obligation of the Lender to consummate the transactions contemplated hereby is subject to the fulfillment to the satisfaction of the Lender on the date hereof of the following conditions precedent:

4.1.1 The representations and warranties contained herein shall be true and accurate on and as of the date hereof, the Borrower shall have performed and complied with all covenants and conditions required herein to be performed or complied with by the Borrower on or prior to date hereof, and no Default shall exist and be continuing on the date hereof.

4.1.2 No event or condition shall have occurred which could reasonably be expected to have a Material Adverse Effect.

4.2 Intentionally Deleted

4.3 Conditions to all Advances. The obligation of the Lender to make any Advance hereunder is subject to the fulfillment to the satisfaction of the Lender immediately prior to or contemporaneously with each such Advance of each of the following conditions:

4.3.1 Delivery by the Borrower to the Lender, not later than three (3) Business Days before the Business Day on which the Borrower desires the advance of an Advance, of either (i) a completed and signed request for such Advance, in the form attached hereto as Exhibit B (each, an "Advance ***Request***"), (ii) ; provided, however, that (a) each Advance Request shall be for an Advance in a minimum principal amount of at least $1,000.00, (b) the Borrower shall not submit more than one (1) Advance Request for funding an Advance during any seven (7) consecutive calendar days, and (c) the request for an Advance must be acceptable in form and substance to the Lender in the Lender's unrestricted discretion; provided, further, that Lender may waive the provisions of this Section 4.3.1 in its sole discretion and charge a transaction fee of up to $75 for each exception.

4.3.2 The representations and warranties contained herein or otherwise made in writing by or on behalf of the Borrower pursuant hereto or in connection with the transactions contemplated hereby shall exist and be true and correct in all material respects at the time of each such Advance with and without giving effect to the Advances to be made and the application of the proceeds thereof.

4.3.3 No Default shall exist and be continuing or result from the advance of such Advance.

4.3.4 No event or condition shall have occurred which could reasonably be expected to have a Material Adverse Effect.

SECTION 5. COVENANTS.

During the term of this Agreement and so long as any Obligations remain outstanding:

5.1 Reporting Requirements. The Borrower shall furnish to the Lender:

5.1.1 promptly after obtaining knowledge of the existence thereof, notice of (a) the occurrence of any event or the existence of any circumstance which constitutes a Default, (b) the occurrence of any condition or event with respect to the Borrower or any Affiliate of the Borrower which could reasonably be expected to have a Material Adverse Effect, (c) any litigation or any investigative proceedings of a federal, state or local governmental agency or authority commenced or threatened against the Borrower or any Affiliate of the Borrower which could reasonably be expected to have a Material Adverse Effect, or the issuance of any judgment, award, decree, order or other determination in or relating to any such litigation or proceedings,

and (d) any communications given or received by the Borrower to or from any federal, state or local governmental agency or authority in any way relating to compliance with, any violation or potential violation of, or any potential liability under, any environmental law or regulation (including those relating to pollution control, hazardous materials and hazardous wastes), along with copies of all such communications; and

5.1.2 from time to time, such other financial data and information about, relating to, or having an impact on, the Borrower as the Lender may reasonably request, including but not limited to monthly balance sheets and related statements of income. Borrower shall promptly deliver in form suitable to Lender any information requested pursuant to this Section, but in no case later than five (5) Business Days after Lender's request.

5.2 Conduct of Business. The Borrower will: (a) intentionally deleted; (b) continue to have a fiscal year ending December 31st of each year (or such other fiscal year-end as may be deemed acceptable to the Lender in its reasonable discretion); (c) remain or engage in substantially the same business operating farm acreage as that in which the Borrower is now engaged or proposed to be engaged as of the date hereof; (d) duly observe and comply with all applicable laws and all requirements of any governmental authorities relative to the Borrower, the Borrower's assets or to the conduct of the Borrower's business, including laws relating to the environment, pollution control, hazardous materials and hazardous waste (except where the failure to observe and comply with such laws or requirements would not have a Material Adverse Effect or materially and adversely affect the ability of the Borrower to perform the Obligations); and (e) maintain and keep in full force and effect all licenses and permits necessary to the proper conduct of the Borrower's business as presently conducted or reasonably related thereto.

5.3 Maintenance and Insurance.

5.3.1 The Borrower will: (a) maintain and keep the Borrower's properties in good repair, working order and condition (normal wear and tear and casualty excepted) so that the Borrower's business may be properly and advantageously conducted at all times; (b) comply with the provisions of all material leases to which the Borrower is a party or under which the Borrower occupies or uses property so as to prevent any material loss or forfeiture thereof or thereunder; (c) maintain insurance with such insurance companies, in such amounts (including, without limitation, so-called "all-risk" coverage at replacement value, "broad form" liability coverage, and "multiple-peril crop insurance" , against such hazards and liabilities and for such purposes as is customary in the industry for companies of established reputation engaged in the same or similar businesses and owning or operating similar properties in similar locales for similar crops, upon terms and conditions reasonably acceptable to the Lender; If the Borrower fails to provide such insurance, the Lender, in its sole discretion, may provide such insurance and charge the cost (plus applicable interest) to the Borrower. Any payment by the Lender for insurance under this Section not recovered from the Borrower within ten (10) Business Days after the Borrower's receipt of an invoice therefore shall, until reimbursed, bear interest at the Default Rate from such time as the Lender incurs such expense. The Lender shall not, by virtue of the fact of the Lender's approving, disapproving, accepting, obtaining or failing to obtain any such insurance, incur any liability including, without limitation, for the form or legal sufficiency of insurance contracts, solvency of insurance companies or payment of lawsuits, and the Borrower hereby expressly assumes full responsibility therefore and liability, if any, thereunder. Upon request of the Lender from time to time, the Borrower shall furnish to the Lender certificates or other evidence satisfactory to the Lender of compliance with the foregoing insurance provisions. The Borrower agrees that any proceeds of property, casualty or crop insurance policies maintained by the Borrower shall be paid to the Lender, and that no other Person (other than Lender) shall be named as an assignee under any assignment of indemnity with respect to any crop insurance covering

the Borrower's crop. Borrower will notify Lender within five (5) days of any event that has the potential for giving rise to a claim under such crop or other insurance.

5.4 Taxes. The Borrower will pay all Taxes on or assessed against the Borrower or the Borrower's properties prior to such Taxes becoming delinquent, except for any Taxes which are being contested in good faith through appropriate proceedings and with respect to which adequate reserves, if and to the extent required by GAAP, have been established and are being maintained, provided that no enforcement action to enforce a lien has been commenced against the Borrower with respect to any such tax, assessment or charge which is material in amount.

5.5 Sale of Notes. The Borrower will not sell, discount or dispose of any note, instrument, account receivable, or other obligation owing to the Borrower, except to the Lender and except for discounts on accounts receivable granted in the ordinary course of business consistent with past practices (such as discounts for prompt payment).

5.6 Inspection by the Lender; Books and Records. The Borrower will permit the Lender or its designees, at any reasonable time and from time to time, during normal business hours, upon prior reasonable notice, to visit and inspect the properties of the Borrower to examine and make copies of the books and records of the Borrower and to discuss the affairs, finances and accounts of the Borrower with appropriate officers; provided, however, that the Lender may require that the Borrower submit copies of the Borrower's books and records via an electronic secure file transfer. The Borrower will keep adequate books and records of account in which true and complete entries will be made reflecting all of its business and financial transactions, and such entries will be made on a cash basis consistent with the preparation of the financial information and documentation previously required by Lender and as may be required by applicable law. Without in any way limiting the foregoing, the Borrower agrees that the Lender may, from time to time, conduct audits of the Borrower at the Lender's discretion, to verify the assets of the Borrower, including examining machinery, buildings, land, crop, and livestock and other assets used to assess the Borrower's creditworthiness. During the existence of an Event of Default, the Borrower shall permit the Lender to arrange for verification of accounts receivable of the Borrower directly with account debtors or by other methods, and to conduct field audits of the Borrower at the Lender's discretion.

5.7 Use of Proceeds. The Borrower will use the proceeds of Advances for general working capital purposes related to the Farm Products described in an Advance Request or order from FBN Inputs, LLC from time to time and approved by the Lender in the Lender's sole discretion. Such general working capital purposes shall not include any use for (i) non-farming purposes; (ii) purchasing any interest in real estate; (iii) paying any debt service with respect to any Indebtedness (except Permitted Indebtedness); (iv) paying any rent with respect to Real Property or lease payments with respect to equipment in excess of the fair market value of such Real Property or equipment; or (v) buying, selling, trading, or entering into any exchange traded contract, including but not limited to listed futures and options contracts.

5.8 Transactions with Affiliates. The Borrower will not directly or indirectly, enter into any material agreements, instruments or contracts (whether written or oral) with any of the Borrower's managers, officers, equityholders, employees, family members, or Affiliates, or the directors, managers, officers, equityholders or employees of its Affiliates, except for those entered into in the ordinary course of business on an arm's length basis upon terms and conditions no more favorable to the other Person party thereto and no less favorable to the Borrower than would prevail in a transaction between the Borrower and a Person unaffiliated with the Borrower.

5.9 No Amendments to Organizational Documents. The Borrower will not at any time cause or permit the charter or operating agreement by-laws of the Borrower to be modified, amended or supplemented in any respect that would materially affect the Lender's rights hereunder and with respect to the Collateral and under the other Loan Documents or affect in any manner the Borrower's ability to pay the Obligations when due. Intentionally deleted.

5.10 Investments. The Borrower will not make any investments (whether by capital contribution or by loan or other Indebtedness) except for investments in: (a) direct obligations of the United States of America, maturing within one year of their issuance; (b) time certificates of deposit or repurchase agreements, maturing within one year of their issuance, from banks in the United States having capital, surplus and undivided profits in excess of $1,000,000,000; (c) short-term commercial paper carrying the highest rating by Moody's or Standard and Poor's Rating Services and issued by corporations headquartered in the United States, in currency of the United States; (d) shares of money-market mutual funds having assets in excess of $100,000,000 and substantially all of the assets of which consist of investments referred to in clauses (a) through (c), inclusive, above; and (e) obligations of the Lender and its affiliates and/or investments otherwise approved in advance in writing by the Lender in its sole discretion.

5.11 Merger and Acquisitions; Asset Sales. The Borrower will not: (a) merge with or into, or consolidate, or cause or permit any Affiliate or Subsidiary to merge with or into, or consolidate, with any other Person; (b) acquire all or substantially all of the assets or all or substantially all of the capital stock, equity or other securities of any Person; or (c) sell, transfer, lease or otherwise dispose of all or substantially all of its assets; in each case, in one transaction or in a series of transactions, or enter into any agreement with respect to any of the foregoing transactions.

5.12 Change in Control. The operations of the Borrower shall continue to be under the control of PWR.

5.13 Limitation of Indebtedness. The Borrower will not create, incur, assume or suffer to exist, or in any manner become or be liable directly or indirectly with respect to, any Indebtedness except for Permitted Indebtedness.

5.14 Restrictions on Liens. The Borrower shall not create, incur, assume or suffer to exist any mortgage, pledge, security interest, lien or other charge or encumbrance, including the lien or retained security title of a conditional vendor ("***Liens***") upon or with respect to any property or assets, real or personal, of the Borrower or assign or otherwise convey any right to receive income, except as approved by Lender.

5.15 Restricted Payments. The Borrower shall not declare or make any Restricted Payments without the prior written consent of the Lender.

5.16 Crop and Real Property. The Borrower agrees that it:

5.16.1 Intentionally Deleted

5.16.2 shall timely pay rent on any portion of the Real Property that is rented and not default on any obligations pursuant to any rental or lease agreements related to the Real Property;

5.16.3 shall farm the Real Property, including, without limitation, selecting the hybrid, applying chemicals, seeds, and fertilizers and harvesting the crops, in a commercially reasonable manner;

5.16.4 shall use commercially reasonable efforts to prevent loss, damage, or destruction, of the Farm Products;

5.16.5 shall use commercially reasonable efforts to prevent misuse, dissipation, commingling, loss, theft, damage or destruction of Farm Products;

5.16.6 shall till, plant, cultivate, spray, irrigate, scout, harvest, and haul the Farm Products in a workmanlike manner (i) in accordance with best management practices; (ii) in compliance with all federal, state and local laws, rules, regulations and ordinances as the same may be amended or enacted from time to time; and (iii) in such manner and practice so as to maximize the yield of the crops from the Real Property;

5.16.7 shall store, handle and apply seed, fertilizer, and agricultural chemicals and till, plant, cultivate, spray, irrigate, scout, harvest, and haul the Farm Products in strict accordance with any applicable product manufacturer's directions and label instructions in order to receive the protection of the applicable manufacturer's product warranty;

5.16.8 shall store, handle and apply seed, fertilizer, and agricultural chemicals in compliance with all federal, state and local laws, rules, regulations and ordinances. Borrower will be solely responsible for any damages, fines, penalties, or claims arising out of Borrower's failure to meet its obligations under this Section; and

5.16.9 Farm Product deliveries shall not be hauled after non-feed materials, animal waste, or rendered products made from ruminant animal parts without a verifiable washout of all truck parts that come in contact with loaded materials. Borrower understands it will be asked to produce previous load tickets and understands that certain previously hauled materials may result in the rejection of the contents of the vehicle.

5.17 Crop and Real Property.

5.17.1 Borrower shall provide to Lender in a timely fashion the following crop data with respect to the Real Property and Collateral:

5.17.1.1 at planting, plant date and plant population; and

5.17.1.2 at harvest, harvest date and yield.

5.17.2 To the extent reasonably available, Borrower will furnish to Lender the following crop data with respect to the Real Property:

5.17.2.1 prior to planting, soil test results, tillage, and tiling information;

5.17.2.2 at planting stage, row spacing;

5.17.2.3 at growing stage, chemicals, fertilizer, insecticides, and herbicides; and

5.17.2.4 at harvest, moisture and yield monitor data and precision data.

5.17.3 Agronomic data, yield information and other information ("***Base Data***") that is furnished to Lender by Borrower will remain the property of Borrower; however, Producer hereby grants to Lender and its affiliates a perpetual, irrevocable, worldwide, non-exclusive, fully paid-up, royalty-free and transferable right and license to possess and use such Base Data for such purposes as Lender and its affiliates deem fit in their sole discretion. Lender and its affiliates may disclose compilations, reports, analyzed data or data derived from Base Data to unaffiliated third parties so long as the identity of Borrower is not disclosed.

5.17.4 Lender and any designee may disclose compilations, reports, analyzed data or data derived from Base Data to unaffiliated third parties so long as the identity of Borrower is not disclosed.

5.17.5 Base Data will be provided in the electronic format specified by Lender (e.g., precision monitor data, Excel workbook or .csv file).

5.17.6 Borrower represents and warrants to Lender that Borrower has and will have all rights necessary to provide the Base Data and grant the license rights above.

5.18 Direct Notice State Requirement. If Borrower resides in or produces Farm Products in a state requiring direct notice to lenders of actual or potential buyers of an agricultural crop or commodity, Borrower shall comply with all such statutory or contractual notice requirements.

SECTION 6. SECURITY.

6.1 Security Interest. As security for the payment and performance of all Obligations (including, without limitation, the Advances and any other advances, obligations, liabilities and credit accommodations incurred or extended hereunder), the Lender shall have and the Borrower hereby grants to the Lender a continuing best available lien on the Collateral.

6.2 No Asset Sales or Liens. The Borrower shall not sell, assign, transfer, set over to, or grant a Lien to any Person in or otherwise encumber the Collateral except with respect to the sale of inventory or Farm Products and obsolete or surplus assets or assets no longer used or useful in the Borrower's business in the ordinary course of business consistent with the Borrower's past practices.

6.3 Location of Records and Collateral. The Borrower shall keep the Collateral and records pertaining to Collateral at the location set forth on the signature page hereto, on the Real Property and at any other location described in a notice from the Borrower to the Lender.

6.4 Status of Collateral. At the time any Collateral becomes subject to the Lender's Lien, the Borrower shall be the lawful owner thereof and shall have good right to pledge, sell, assign, transfer or grant a security interest in the same to the Lender.

6.5 Perfection Information. The Borrower's correct legal name(s), are set forth on the signature page hereto. The Borrower shall not change any such name, jurisdiction or its legal structure without giving at least thirty (30) days' prior notice thereof to the Lender.

6.6 Perfection, Third Parties, Further Assurances. The Borrower authorizes the Lender to file any UCC financing statements as may be contemplated herein, and effective finance statements under the Food Security Act and amendments thereto and continuations thereof, describing the Collateral necessary to perfect and otherwise protect the Lender's security interest hereunder. Where the Collateral is in the possession of a third party, if requested by the

Lender, the Borrower will join with the Lender in notifying the third party of the Lender's security interest and obtaining an acknowledgment from such third party that it is holding the Collateral for the benefit of the Lender. The Borrower will cooperate with the Lender, at the Lender's request, in obtaining control with respect to Collateral consisting of deposit accounts, investment property, letter of credit rights and electronic chattel paper. The Borrower agrees to take whatever other actions are reasonably requested by the Lender from time to time to perfect and continue the perfection of the Lender's security interest in the Collateral, and to protect, preserve and realize upon the Collateral. Upon request of the Lender, the Borrower will deliver to the Lender any and all of the documents evidencing or constituting the Collateral (including, without limitation, any and all negotiable documents, instruments, certificated securities and chattel paper). The Borrower hereby appoints the Lender as the Borrower's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the perfection of the security interest granted in this Agreement and to protect, preserve and realize upon the Collateral. The Collateral is and shall remain personal property even though all or any portion of the Collateral may hereafter become attached or affixed to real property. The Borrower acknowledges and agrees that the foregoing power of attorney is coupled with an interest.

6.7 Termination; Revival. At such time as the Obligations have been paid in full (other than unasserted indemnity claims which survive termination) and the Lender shall be under no further obligation to extend credit to or enter into credit arrangements with the Borrower under this Agreement or any other Loan Document, the security interest granted herein shall terminate and, at the expense of the Borrower, the Lender will release its security interest in, and will duly assign, transfer and deliver to the Borrower such of the Collateral as has not theretofore been sold or otherwise applied or released pursuant to this Agreement or under applicable law. To the extent that the Borrower makes a payment or other transfer to the Lender, or the Lender receives any payment of proceeds of Collateral, which is later invalidated, declared to be a fraudulent transfer or preference, set aside or required to be repaid under any bankruptcy law, other law or equitable principle, the Lender's security interest in the Collateral shall be revived and continue as if the payment, transfer or proceeds had never been received by the Lender.

6.8 Location of Farm Products. The Borrower shall not store any Collateral consisting of Farm Products in warehouse facilities or otherwise without the prior written consent of the Lender and the form of warehouse receipt proposed to be issued upon such storage shall be delivered directly to the Lender.

SECTION 7. EVENTS OF DEFAULT; ACCELERATION.

7.1 The following shall each constitute an "***Event of Default***":

7.1.1 (a) default in the payment when due of any principal of the Advances and interest on any Obligation, or (b) default in the payment of any other Obligation and such default continues for two (2) Business Days beyond the date when payment was due and payable, or (c) a default in the payment or a breach of any other obligation to the Lender or an affiliate of the Lender;

7.1.2 the Borrower's failure to comply with (a) Section 4.2, (b) the covenant to maintain the insurance coverages described in Section 5.3, or (c) the covenants set forth in Sections 5.11, 5.12, 5.16, or 6.2;

7.1.3 the Borrower sells, assigns, transfers or disposes of the Collateral without Lender's prior written consent;

7.1.4 loss, damage, or destruction, of the Collateral;

7.1.5 default in the performance or observance of or compliance with the Borrower’s agreements and covenants set forth in the Loan Documents (other than those described in Sections 7.1.1 and 7.1.2), and such default continues for more than (10) Business Days after notice from the Lender thereof;

7.1.6 any representation or warranty at any time made by or on behalf of the Borrower in any Loan Document or otherwise shall prove to have been false in any material respect upon the date when made or deemed to have been made;

7.1.7 the Borrower shall be in default or breach of any recourse obligations aggregating $10,000.00 or more and such default or breach continues uncured or unwaived beyond any applicable grace or cure period;

7.1.8 issuance of any injunctions which have a Material Adverse Effect, or issuance of any attachments which in the aggregate exceed $10,000.00 in value, against the Borrower which is not dismissed or bonded, to the satisfaction of the Lender, within sixty (60) days after its issuance;

7.1.9 calling of a meeting of creditors, formation or appointment of a committee of creditors or liquidating agents or offering of a composition or extension to creditors by, for or with the consent or acquiescence of the Borrower;

7.1.10 Insolvency of the Borrower;

7.1.11 any money judgments aggregating in excess of $10,000.00 are entered against the Borrower (except to the extent fully covered by insurance and the insurance carrier has confirmed coverage without reservation of rights), and shall continue unsatisfied and in effect for a period of sixty (60) days;

7.1.12 any garnishment, levy or execution is issued and served upon the Lender, which garnishment, levy or execution covers any material portion of property of the Borrower in the possession of the Lender;

7.1.13 (a) any Loan Document, or any covenant, agreement or obligation contained therein or evidenced thereby, shall cease in any material respect to be legal, valid, binding or enforceable in accordance with its terms, or shall be cancelled, terminated, revoked or rescinded other than in accordance with the terms hereof or thereof, (b) any action at law, suit in equity or other legal proceeding to cancel, revoke or rescind any Loan Document shall be commenced by or on behalf of the Borrower, or (c) any court or any other governmental or regulatory authority or agency of competent jurisdiction shall make a determination that, or shall issue a judgment, order, decree or ruling to the effect that, any one or more of the Loan Documents, or any one or more of the obligations of the Borrower thereunder, are illegal, invalid or unenforceable in any material respect in accordance with the terms thereof;

7.1.14 **the security interests granted by the Borrower under the Loan Documents shall cease to be valid, or shall fail to be perfected (other than through action or inaction by the Lender), or any Person shall successfully contest the validity, priority, enforceability, or perfection of any such security interests; or**

7.1.15 the occurrence of any event or condition that the Lender determines, in its reasonable discretion, could have a Material Adverse Effect.

7.2 If an Event of Default shall occur and be continuing, the Lender may, at its option (and shall be automatically deemed to have done so without any further action on its part in the case of an Event of Default pursuant to Sections 7.1.9, 7.1.10 or 7.1.11 hereof) do one or more of the following: (a) declare any or all of the Obligations to be immediately due and payable, whereupon the same shall become immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby waived by the Borrower, and the Maturity Date shall be deemed to have been accelerated to the date of such declaration; (b) limit, suspend or terminate the Borrower's right to borrow and the Lender's commitment to make Advances hereunder; and (c) exercise any rights and remedies under the Loan Documents and applicable law.

7.3 Without limiting the foregoing, upon the occurrence of any Event of Default and at any time thereafter during the continuation thereof, the Lender shall have the right to take immediate possession of the Collateral, and for that purpose the Lender may, so far as the Borrower can give authority therefore, enter upon any premises on which Collateral may be situated and remove the same therefrom. The Borrower waives demand and notice with respect to and assent to any repossession of Collateral. The Lender may dispose of Collateral in any order and in any manner it chooses and may refrain from the sale of any real property held as Collateral until the sale of personal property. Except for Collateral which is perishable or threatens to decline speedily in value or which is of a type customarily sold on a recognized market, the Lender shall give to the Borrower at least ten (10) Business Days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. The Borrower shall remain liable for any deficiency.

7.4 Upon the occurrence and during the continuation of an Event of Default the Lender may at any time in its sole discretion (a) transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for Obligations or apply it on principal or interest due on Obligations; (b) without notice to or demand on the Borrower, demand and collect Collateral consisting of accounts receivable or instruments as the Lender may determine; (c) make certain Advances ("***Protective Advances***") if Lender deems such Advances necessary or desirable to preserve or protect any Collateral, or to enhance the collectibility or repayment of Obligations and all such Protective Advances shall be Obligations, secured by the Collateral; and (d) for the purpose of realizing the Lender's rights therein, receive, open and dispose of mail addressed to the Borrower and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of Collateral on behalf of and in the name of the Borrower. The powers conferred on the Lender by this Section are solely to protect the interest of the Lender and shall not impose any duties on the Lender to exercise any powers.

7.5 In addition to all other rights and remedies provided hereunder or by law, the Lender shall have in any jurisdiction where enforcement hereof is sought the rights and remedies of a secured party under the UCC.

SECTION 8. SET OFF.

The Borrower hereby grants to the Lender a continuing lien, security interest and right of setoff as security for all of the Obligations, whether now existing or hereafter arising, upon and against all deposits, deposit accounts, credits, collateral, contractual obligations and property, now or hereafter in the possession, custody, safekeeping or control of the Lender or any affiliate

of the Lender (and their respective successors and assigns) or in transit to any of them. At any time after the occurrence and during the continuance of an Event of Default, without demand or notice (any such notice being expressly waived by the Borrower), the Lender may set off the same or any part thereof and apply the same to any of the Obligations even though unmatured and regardless of the adequacy of any other collateral securing the Obligations.

**ANY AND ALL RIGHTS TO REQUIRE THE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.**

SECTION 9. GENERAL.

9.1 Written Notices. Any notices or consents expressly required or permitted by this Agreement shall be in writing, and shall be deemed to have been given (a) when delivered by hand, when sent by facsimile or when sent by electronic mail, (b) one (1) Business Day after delivery to any national overnight delivery service (delivery charges prepaid), or (c) three (3) Business Days after deposit in the U.S. mails (postage prepaid, certified and return receipt requested); addressed to the parties at the addresses set forth on the signature pages hereto, or, in either case, to such other address as a party may designate in a written notice to the other party given in accordance with this Section. You acknowledge and agree that we may provide you with notices in electronic format, and that we are not required to send a paper document to you, unless and until you withdraw your consent as described below. All notices that we provide to you in electronic format will be provided via e-mail.

9.2 Term of Agreement. This Agreement shall continue in force and effect so long as any commitment to extend Advances or any portion of the Obligations shall be outstanding or shall arise.

9.3 No Waivers. No failure or delay by the Lender in exercising any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law.

9.4 Further Assurances. The Borrower shall do, make, execute and deliver all such additional and further acts, things, assurances, and instruments as the Lender at any time may reasonably require more completely to vest in and assure to the Lender its rights hereunder and under the other Loan Documents, and in the Collateral, and to carry into effect the provisions and intent of this Agreement and the other Loan Documents.

9.5 Governing Law; Jurisdiction. This Agreement and the other Loan Documents shall be construed in accordance with and governed by the laws of the State of Illinois (without regard to conflicts of laws rules). Any legal action or proceeding arising out of or relating to this Agreement or any Obligation may be instituted in the state or federal courts located in Chicago, Illinois, and the Borrower hereby irrevocably submits to the jurisdiction of each such court in any such action or proceeding; provided, however, that the foregoing shall not limit the Lender's rights to bring any legal action or proceeding in any other appropriate jurisdiction in its unrestricted discretion.

9.6 Indemnification. The Borrower hereby absolutely and unconditionally indemnifies and holds the Lender and its affiliates (and the shareholders, directors, officers, employees and agents of the Lender or its affiliates) (each, an "***Indemnitee***") harmless against any and all claims, demands, suits, actions, causes of action, damages, losses, settlement payments, obligations, costs, expenses and all other liabilities whatsoever which shall at any time or times be incurred or sustained by an Indemnitee (except any of the foregoing incurred or sustained as a result of the gross negligence or willful misconduct of an Indemnitee) on account of, or in relation to, or in any way in connection with, associated with or ancillary to this Agreement, the Note, the other Loan Documents and the other documents executed or delivered in connection herewith, and the arrangements or transactions contemplated therein, whether or not all or any of the transactions contemplated by, associated with or ancillary to this Agreement or any of such documents are ultimately consummated.

9.7 Amendments, Waivers, Etc. This Agreement and the other Loan Documents, and any provision hereof or thereof, may be waived only by an instrument in writing signed by the Lender and may be amended only by an instrument in writing signed by the Borrower and the Lender.

9.8 Binding Effect of Agreement; Assignment. This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns. The Lender may sell, assign, grant participations in or otherwise transfer all or any portion of its right, title and interest in, and its obligations under, this Agreement and the other Loan Documents to any Person without notice to or consent from the Borrower. The Lender may disclose to prospective assignees, participants, purchasers or transferees, their agents and attorneys, any financial or other information in the Lender's possession regarding the Borrower, provided that the Lender shall require such information to be maintained as confidential by any proposed assignee, purchaser or transferee. In connection with any such sale, assignment or transfer the Borrower shall execute and deliver such documents, instruments and agreements as the Lender or its proposed assignee may reasonably request to affect such sale, assignment or transfer. The Lender shall be released from its obligations hereunder to the extent of such sale, assignment or transfer and to the extent such obligations arise after the date thereof. The Borrower may not sell, assign or transfer the Borrower's rights or obligations hereunder.

9.9 Application of Payments. All payments made by the Borrower hereunder, at such time as no Event of Default is outstanding, shall be applied first to the payment of all reasonable fees, expenses and other amounts due to the Lender (excluding principal and interest), then to accrued and unpaid interest, and then to the outstanding principal balance of the Obligations; provided, however, that during the existence of an Event of Default, payments will be applied to the Obligations as the Lender determines in its unrestricted discretion.

9.10 Replacement Documents. Upon receipt of an affidavit of an officer of the Lender as to the loss, theft, destruction or mutilation of any of the Loan Documents, and a written undertaking from the Lender to indemnify the Borrower from all claims, damages and expenses incurred by the Borrower as a result of such loss, theft, destruction or mutilation, in form reasonably satisfactory to the Borrower, the Borrower will issue, in lieu thereof, a replacement therefore, in the same principal amount thereof (if applicable) and otherwise of like tenor.

9.11 Entire Agreement; Miscellaneous. This Agreement and the other Loan Documents, including the exhibits hereto and thereto, set forth the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and supersedes all prior agreements, promises, covenants, arrangements, communications, representations, warranties, whether oral or written, by any officer, employee or representative of

any party hereto. The captions of the sections of this Agreement are for ease of reference only and are not an integral part of this Agreement. This Agreement may be signed in any number of counterparts with the same effect as if the signatures hereto and thereto were upon the same instrument. This Agreement may also be executed and delivered by facsimile signature, PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (e.g. www.docusign.com). The provisions of this Agreement are severable, and if any of these provisions shall be held by any court of competent jurisdiction to be unenforceable under a particular circumstances, such holdings shall not affect or impair such provisions under different circumstances or any other provision hereof.

9.12 Joint and Several Liability. If more than one person or entity executes this Agreement and the other Loan Documents as Borrower, their execution of this Agreement and the other Loan Documents will constitute their covenant and agreement that (i) each of them is jointly and severally liable for the keeping, observing and performing of all of the terms, covenants, conditions, provisions and agreements of this Agreement and the other Loan Documents to be kept, observed and performed by Borrower, and (ii) the term "Borrower" as used in this Agreement and the other Loan Documents means and includes each of them jointly and severally. The act of or notice from, or notice or refund to, or the signature of any one or more of them, with respect to this Agreement and the other Loan Documents, will be binding upon each and all of the persons and entities executing this Agreement and the other Loan Documents as Borrower with the same force and effect as if each and all of them had so acted or so given or received such notice or refund or so signed. The compromise of any claim with, or the release of, any Borrower shall not constitute a compromise with, or a release of, any other Borrower

9.13 WAIVER OF JURY TRIAL, SERVICE OF PROCESS AND DAMAGES.

**EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF THE LENDER RELATING TO THE ADMINISTRATION OF THE ADVANCES OR ENFORCEMENT OF THE LOAN DOCUMENTS. THE BORROWER HEREBY AGREES THE BORROWER SHALL NOT SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY CANNOT BE OR HAS NOT BEEN WAIVED.**

**IN ANY ACTION OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR THE INTERPRETATION OR ENFORCEMENT HEREOF OR THEREOF, THE BORROWER HEREBY ABSOLUTELY AND IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT, DECLARATION OR OTHER PROCESS AND HEREBY ABSOLUTELY AND IRREVOCABLY AGREES THAT THE SERVICE THEREOF MAY BE MADE IN THE MANNER AND TO THE ADDRESS SPECIFIED FOR NOTICES ON THE SIGNATURE PAGE HERETO.**

**EXCEPT AS PROHIBITED BY LAW, THE BORROWER HEREBY WAIVES ANY RIGHT THE BORROWER MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.**

**THE BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS AND AGREEMENTS, EACH OF WHICH CONSTITUTE A MATERIAL INDUCEMENT FOR THE LENDER TO ACCEPT THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND TO MAKE THE ADVANCES.**

- *Remainder of Page Intentionally Left Blank; Signature Page Follows -*

IN WITNESS WHEREOF, the parties have caused this Loan and Security Agreement to be executed under seal by their respective duly authorized officers as of the date first above written.

**BORROWER:**

Peter Wayne Restad

By: DocuSigned by: Peter Wayne Restad
EC73DF2BDC7E4D7...
Peter Wayne Restad
(Printed Name and/or Title)

Address for Notices:
44334 County Highway 113, Pelican Rapids, Minnesota 56572, United States

Telephone: (218) 770-6622
Email: restadca@gmail.com

**LENDER:**

FBN FINANCE, LLC

By: DocuSigned by: TJ Wilson
C0881A3B18FC4E0...
TJ Wilson Head of Sales, FBN Finance

Contact for Notices:
FBN Finance, LLC
Telephone: (650) 226-3409
Email: legal@farmersbusinessnetwork.com

<u>EXHIBIT A</u>: <u>DEFINITIONS</u>

"***Advance***" or "***Advances***" are defined in Section 2.1.1.

"***Advance Request***" is defined in Section 4.3.1.

"***Affiliate***" means any Person controlling, controlled by or under common control with, the Borrower.

"***Agreement***" means this Agreement, including the exhibits and Disclosure Schedule attached hereto, as originally executed, or if this Agreement is amended, varied, restated or supplemented from time to time, as so amended, varied, restated or supplemented.

"***Borrower***" is defined in the introductory paragraph.

"***Business Day***" means any day except a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"***Collateral***" means, collectively, all right, title and interest of the Borrower in, to and under the following personal property, whether now or hereafter existing, whether planted or to be planted, whether grown or to be grown, whether now owned or hereafter acquired, and wherever located: all crops, including all annual and perennial crops and products thereof, either before or after harvest, and all additions and substitutions thereof, growing or planted, or to be grown or to be planted, on the real property. Also including collectively all warehouse receipts or other documents (negotiable or non-negotiable) issued for storage of such crops; all seed, fertilizer, chemicals and petroleum, and any other crop input products; all contract rights, chattel paper, documents, instruments, accounts, general intangibles, and cash and non cash proceeds from the sale, exchange, collection, or disposition of any of the crops. Also including all "multiple-peril crop insurance policies" and other crop insurance policies, and all entitlements, rights to payment, and payments (in whatever form received, including, but not limited to, payments in cash or in kind) under any current or future state or federal governmental programs, including, but not limited to, governmental agricultural diversion, assistance, subsidy, deficiency, conservation, or disaster programs and the United States Department of Agriculture Farm Service Agency Feed Grain Program, and all proceeds of the foregoing.

"**Credit Application**" means that certain Finance Commercial Credit Application, and all documents required thereby and delivered by the Borrower to the Lender in connection therewith, completed and delivered to the Lender by the Borrower.

"***Default***" means an Event of Default or an event or condition that, but for the requirement that time elapse or notice be given, or both, would constitute an Event of Default.

"***Default Rate***" is defined in Section 2.2.

"***Event of Default***" is defined in Section 7.1.

"***Farm Products***" is defined in the definition of "***Collateral***."

"***Food Security Act***" means the Federal Food Security Act of 1985, Public Law 99-108, § 1324, and any applicable provisions of the UCC.

"***GAAP***" means generally accepted accounting principles consistently applied as in effect from time to time.

"***Government Payments***" is defined in the definition of "***Collateral***."

"***Indebtedness***" with respect to any Person means and includes, without duplication, (i) all items which, in accordance with GAAP, would be included as a liability on the balance sheet of such Person, (ii) the face amount of all banker's acceptances and of all letters of credit issued by any bank for the account of such Person and all drafts drawn thereunder to the extent unreimbursed, (iii) the total amount of all indebtedness secured by any Lien to which any property or asset of such Person is subject, whether or not the indebtedness secured thereby shall have been assumed, and (iv) the total amount of all indebtedness and obligations of others which such Person has directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, including, without limitation, any agreement (a) to advance or supply funds to such other Person to maintain working capital, equity capital, net worth or solvency, or (b) otherwise to assure or hold harmless such other Person against loss in respect of its obligations.

"***Indemnitee***" is defined in Section 9.6.

"***Insolvent***" or "***Insolvency***" means that there shall have occurred one or more of the following events with respect to a Person: death; dissolution; liquidation; termination of existence; "insolvent" or "insolvency" within the meaning of the United States Bankruptcy Code or other applicable statute; such Person's inability to pay its debts as they come due or failure to have adequate capital to conduct its business; such Person's failure to have assets having a fair saleable value net of any cost to dispose of such assets in excess of the amount required to pay the probable liability on its then existing debts (including unmatured, unliquidated and contingent debts); appointment of a receiver of any part of the property of, execution of a trust mortgage or any assignment for the benefit of creditors by, or the filing of a petition in bankruptcy or the commencement of any proceedings under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness or reorganization of debtors by or against such Person, or the offering of a plan to creditors or such Person for composition or extension, except for any involuntary proceeding commenced against such Person which is dismissed within sixty (60) days after the commencement thereof without the entry of an order for relief or the appointment of a trustee.

"***Lender***" is defined in the introductory paragraph.

"***Lien***" is defined in Section 5.14.

"***Loan Documents***" means, collectively, the instruments, certificates, agreements and other documents related to the Advances, all schedules and exhibits thereto, and any other agreements, instruments or documents referred to herein or therein and/or delivered in connection herewith or therewith.

"***Loan Account***" is defined in Section 2.7.

"***Loan Funding Account***" means that certain bank account set up by the Borrower at a bank confirmed by Borrower to Lender, which Loan Funding Account shall be utilized by the Lender to fund Advances requested via the delivery of an Advance Request.

"***Material Adverse Effect***" means a material and adverse effect on the business, properties or condition, financial or otherwise, of the Borrower, taken as a whole, as determined in the Lender's reasonable discretion.

"***Maturity Date***" is March 1, 2024, or such earlier date on which repayment of all Obligations become due and payable upon acceleration pursuant to the terms of Section 7 hereof.

"***Note***" is defined in Section 2.1.1.

"***Obligations***" means any and all obligations of the Borrower to the Lender of every kind and description arising under the Loan Documents, whether direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, and includes obligations under the Loan Documents to perform acts and to refrain from acting as well as obligations to pay money. The following shall also constitute Obligations hereunder: all fees and expenses of the Lender reimbursable by the Borrower hereunder.

"***Permitted Indebtedness***" means Indebtedness consisting of:

(a) the Obligations and any other Indebtedness of the Borrower to the Lender;

(b) trade payables not then more than thirty (30) days overdue incurred in the ordinary course of the Borrower's business;

(c) Indebtedness in respect of Taxes or levies and claims for labor, materials and supplies to the extent payment thereof shall not at the time be required to be made in accordance with the provisions of Section 5.4; or

(d) Indebtedness consisting of purchase money financing of capital assets to the extent such Indebtedness does not exceed the lesser of (i) the lesser of the cost of such assets or their fair market value at the time of acquisition, or (ii) $10,000.00 in the aggregate at any time.

"***Person***" means an individual, estate, corporation, partnership, limited liability company, association, joint stock company, trust, unincorporated organization or other entity.

"***Protective Advances***" is defined in Section 7.4

"***Real Property***" is defined as the real property that is owned, leased or otherwise controlled by the Borrower at which the Borrower engages in farming operations.

"***Restricted Payments***" means (a) any dividends or other distribution, direct or indirect, on account of any shares of any class of capital stock or any equity interest or security of the Borrower, and (b) any payment by the Borrower made in connection with the redemption, retirement, purchase or other acquisition, direct or indirect, of any shares of any class of capital stock or other equity interest or security of the Borrower or of any warrants, rights or options to acquire the same.

"***Subsidiary***" means any corporation, association, partnership, limited liability company, trust or other business entity of which the designated parent shall at any time own directly or indirectly through ownership or control of at least a majority (by number of votes or controlling interests) of the outstanding voting interests of such entity.

"***Taxes***" means, any and all taxes (including, without limitation income, receipts, franchise, ad valorem or excise taxes, transfer or gains taxes or fees, use taxes, withholding, payroll or minimum taxes) imposed on, or otherwise payable by, or for which responsibility for payment, withholding or collection lies with, the Borrower by any governmental authority, federal, state, local or otherwise, including any taxes imposed on the Borrower's Subsidiaries for which the Borrower may be liable under applicable law or by agreement to which the Borrower is a party or by which the Borrower is bound or subject to, and including, but not limited to, any interest, penalties or additions to tax with respect thereto.

"***UCC***" means the Uniform Commercial Code of the applicable jurisdiction as contemplated herein.

<u>Disclosure Schedule</u>

| | | |
|---|---|---|
| | | |
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| | | |

EXHIBIT B: ADVANCE REQUEST

**Capitalized terms used herein and not otherwise defined herein shall have the meanings given such terms in the Loan and Security Agreement between the borrower or entity named below and FBN Finance, LLC .**

Borrower Name: ______________________________________________

Entity Name (if applicable): ____________________________________

Amount Requested: ___________________________________________

Proposed Use of Proceeds:

Please attach supporting documentation here, if applicable (e.g. payoff statement)

Requested Method of Disbursement:

- ❑ ACH (No Fee) - Funds received within 3 business days
- ❑ Wire ($75 fee deducted from amount requested) - Funds received within 2 business days

**The Borrower hereby gives notice pursuant to Section 2.1.1 and Section 4.3 of the Agreement of its request to have the above Advance made to it.**

**The Advance requested hereby complies with the requirements of the Loan and Security Agreement between Borrower and Lender.**

**Each representation and warranty made under Section 3 of the Agreement is true and correct at and as of the date hereof and will be true and correct at and as of the time the Advance is made (except as it relates to acres planted, which may have changed and is reflected in Borrower's current crop year planting information), in each case both with and without giving effect to the Advance and the application of the proceeds thereof.**

By: ________________________________
(Signature)

Its: ________________________________
(Printed Name and Title)

**CREDIT NOTE**

$500,000.00
Pelican Rapids, MN
April 10, 2023

FOR VALUE RECEIVED, Peter Wayne Restad, an Individual (the "***Borrower***"), hereby promises to pay to the order of FBN Finance, LLC, a Delaware limited liability company , (together with its successors and assigns, the "***Lender***"), on or prior to March 1, 2024 (the "***Maturity Date***"), the maximum principal amount of $500,000.00 and 00/100 Dollars ($500,000.00), or, if less, the aggregate unpaid principal amount of all Advances made by the Lender to the Borrowers pursuant to the Agreement (as defined below), from time to time, together with interest on the unpaid principal amount hereof until paid at the rates per annum set forth below.

1. The Agreement. This Credit Note (this "***Note***") is the promissory note described in Section 2.1.1 of that certain Loan and Security Agreement, of even date herewith, between the Lender and the Borrower (as amended, restated, supplemented or otherwise modified from time to time, the "***Agreement***"). Capitalized terms used herein and not otherwise defined herein shall have the meanings given such terms in the Agreement. This Note is issued pursuant to, is entitled to the benefit of, and is subject to the provisions of the Agreement and the other Loan Documents, but neither this reference to the Agreement, the other Loan Documents, nor any provision thereof shall affect or impair the absolute and unconditional obligation of the Borrower to pay the principal of and interest on this Note as herein provided, subject only to any applicable notice and grace periods in the Agreement. The indebtedness evidenced by this Note is secured by the liens and security interests described in the Agreement and the other Loan Documents.

2. Principal Advances; Revolving Loan. The Borrower may request that the Lender advance Advances from time to time in accordance with the terms of the Agreement. Subject to the terms and provisions of the Agreement, Borrower may use all or any part of the credit provided to the Borrower evidenced by this Note and the Advances made hereunder at any time before the Maturity Date. Borrower may borrow, pay, reborrow, and repay the amounts provided for under the Advances, and except as provided for in the Agreement, there is no limitation on the number of Advances made hereunder.

3. Interest. Interest shall accrue in arrears on the unpaid Advances at the initial rate of interest per annum equal to eight and one tenth percent (8.1%), which is the Wall Street Journal Prime Rate as published in the "Money Rates" table in the Wall Street Journal from time to time, which will be the "prime rate", plus the margin amount that Lender adds, which is 0.10 as of the date of this Agreement.

4. Interest Computations. Interest due with respect to this Note shall be computed on the basis of a year of 365 days and paid in arrears for the actual number of days elapsed. If the due date for any payment required under this Note is extended by operation of law, interest shall be payable for such extended time. If any payment required under this Note is due on a day which is not a Business Day, such payment may be made on the earlier to occur of (a) the Maturity Date and (b) the next succeeding Business Day, and any such extension shall be included in computing interest in connection with such payment.

5. Interest Payments. All accrued and unpaid interest (plus all fees, charges and premiums and all costs and expenses payable to the Lender) shall be due and payable in full in arrears on the Maturity Date.

6. Repayment of Principal and Other Obligations. All outstanding principal of the Advances shall be due and payable on the Maturity Date. In addition, on the Maturity Date, all other outstanding Obligations shall be due and payable in full.

7. Prepayment; No Further Advances. The Borrower may prepay all or a portion of the outstanding principal and interest balance of this Note in whole or in part at any time, without premium or additional charge.

8. Acceleration; Default Interest. Upon the occurrence of an Event of Default, and the continuation of the same unwaived, at the sole discretion of the Lender, (a) the aggregate unpaid principal balance of this Note, plus accrued interest hereon and all other unpaid Obligations with respect hereto, may become or may be declared to be due and payable in the manner and with the effect provided in the Agreement, and (b) all Obligations evidenced hereby shall bear interest at the Default Rate.

9. Application of Payments. Any payments received by the Lender with respect to this Note prior to the occurrence of an Event of Default shall be applied first to any reasonable costs, expenses, fees or premiums due to the Lender, second to any unpaid accrued interest hereunder, and third to the unpaid principal hereunder. Any payments received after the occurrence of an Event of Default shall be applied to the Obligations in such a manner as the Lender may determine.

10. Place for Payments. All payments under this Note shall be made at the office of the Lender at the address set forth on the signature page hereto (or at such other place as the Lender may designate from time to time in writing) in lawful money of the United States of America in federal or other immediately available funds.

11. Waivers by Borrower. The Borrower hereby waives presentment, demand, notice of dishonor, protest and all other demands and notices (except as provided in or required by the Agreement) in connection with the delivery, acceptance, performance and enforcement of this Note. The Borrower's liability hereunder shall remain unimpaired notwithstanding any extension of the time for payment or other indulgence granted by the Lender, or the release of all or any part of the security granted to the Lender, in connection with the indebtedness evidenced hereby or the liability of any party which may assume or otherwise be liable for the obligation to make payment of the indebtedness evidenced hereby or the performance of the Obligations of the Borrower under any of the Loan Documents.

12. Business Purposes. The Borrower represents to the Lender that the proceeds of this Note will be used solely for business purposes in conformity with the terms of the Agreement, and shall not be used for personal, family, or household purposes.

13. Note as Loan Document. This Note constitutes a Loan Document under and as defined in the Agreement and shall be governed by the provisions of the Agreement pertaining to setoff, governing law, and jurisdiction and forum. In furtherance of the foregoing, the provisions of

Section 8 and Section 9.5 of the Agreement are expressly incorporated herein by reference, *mutatis mutandis*.

14. Signature. This Note may also be executed and delivered by facsimile signature, PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (e.g. www.docusign.com).

15. WAIVER OF JURY TRIAL, SERVICE OF PROCESS AND DAMAGES. **THE BORROWER, AND BY ITS ACCEPTANCE HEREOF, THE LENDER, HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE BORROWER OR THE LENDER, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF THE LENDER RELATING TO THE ADVANCES OR ENFORCEMENT OF THIS NOTE OR THE OTHER LOAN DOCUMENTS. THE BORROWER HEREBY AGREES IT SHALL NOT SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY CANNOT BE OR HAS NOT BEEN WAIVED.**

**IN ANY ACTION OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS NOTE, OR THE INTERPRETATION OR ENFORCEMENT HEREOF, THE BORROWER HEREBY ABSOLUTELY AND IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT, DECLARATION OR OTHER PROCESS AND HEREBY ABSOLUTELY AND IRREVOCABLY AGREES THAT THE SERVICE THEREOF MAY BE MADE IN THE MANNER AND TO THE ADDRESS SPECIFIED FOR NOTICES IN THE AGREEMENT.**

**EXCEPT AS PROHIBITED BY LAW, THE BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.**

**THE BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS AND AGREEMENTS, EACH OF WHICH CONSTITUTE A MATERIAL INDUCEMENT FOR THE LENDER TO ACCEPT THIS NOTE AND TO MAKE ADVANCES.**

- *Remainder of Page Intentionally Left Blank; Signature Page Follow* -

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed and delivered under seal by its duly authorized officer or representative as of the date first above written.

**BORROWER:**

Peter Wayne Restad

By: DocuSigned by: Peter Wayne Restad
EC73DF2BDC7E4D7...
Peter Wayne Restad
(Printed Name and/or Title)